## PLM FINANCIAL SERVICES, INC. and PLM Investment Management, Inc.

v.

## COAST TO COAST TRUCKING, INC.

### Civ. A. No. 87–4512.

United States District Court,
E.D. Pennsylvania.

Aug. 23, 1988.

Howard D. Scher, John J. Levy, Philadelphia, Pa., for plaintiffs.

Joseph N. Bongiovanni, III, Philadelphia, Pa., Thomas X. Foley, Holmdel, N.J., for defendant.

## MEMORANDUM AND ORDER

VAN ANTWERPEN, District Judge.

This matter comes before the court on the defendant's motion to dismiss and/or stay proceedings in the captioned action. The defendant argues that this action cannot proceed because a necessary or indispensable party, Lone Star Peterbilt Truck Leasing, Inc. (hereinafter "Lone Star") cannot be joined because Lone Star has filed for bankruptcy in Texas. Before addressing the issue of whether Lone Star is a necessary or indispensable party to this action, under Fed.R.Civ.P. 19, a brief recounting of the facts will first be necessary.

In December, 1985, and August, 1986, the plaintiffs leased thirty specially designed and built tractor-trailers called "Maxi–Cubes" to Lone Star. In July, 1985, Lone Star subleased the Maxi–Cubes to the defendant, Coast to Coast Trucking, Inc., pursuant to certain sublease agreements called "Paclease Agreements". Sometime after July, 1985, the defendant defaulted on the payment of its monthly rent to Lone Star under these Paclease Agreements.

In December, 1985, Lone Star brought suit (Civil Action No. CA 3–85–2596–T) in the United States District Court for the Northern District of Texas, Dallas Division, against the defendant alleging, *inter alia* that the defendant defaulted on the payment of its monthly rent to Lone Star for the Maxi–Cubes. The defendant, in that litigation, asserted substantial counterclaims based on fraudulent misrepresentations and breach of various warranties.

On June 16, 1986, the defendant entered into a settlement agreement with Lone Star based on a stipulation of facts between the

parties. In the stipulation and agreement, the defendant admitted that it owed Lone Star $301,403.46 for defaulted rental payments due but unpaid and accruing through April 30, 1986 on the Maxi–Cubes. The defendant agreed to make restitution to Lone Star on this arrearage. The defendant also agreed to make timely rental payments of $74,100.00 per month continuing until the expiration of the Paclease Agreements. This stipulation and agreement settled a portion of the dispute which formed the basis of the Texas action.

On October 7, 1986, Lone Star, owing payments under its own contracts with the plaintiffs, assigned to the plaintiff "PLM Investment Management, Inc., as agent for various principals", ("PLM"), the stipulation and agreement.[1] Since the defendant is moving to dismiss for failure to join a party under Fed.R.Civ.P. 19, it is making a motion to dismiss under Fed.R.Civ.P. 12(b)(7). "For the purposes of these motions well-pleaded factual allegations contained in the ... complaint are accepted as true." *McCann v. Pierson*, 78 F.R.D. 347, 348–349 (E.D.Pa.1978). Paragraph 14 of the complaint alleges:

"14. On or about October 7, 1986, Lone Star assigned to PLM the Stipulation and Agreement, *together with Lone Star's rights, title and interest in and to the Paclease Agreements* and to the rental payments then owed and thereafter accruing to Lone Star pursuant to the Paclease Agreements. A true and correct copy of the Assignment Agreement is attached hereto as Exhibit C." (Emphasis supplied).

Although the plaintiffs allege that Lone Star assigned its "rights, title and interest in and to the Paclease Agreements",[2] a reading of the assignment itself reveals that this is not really the case. The assignment reads in pertinent part:

"NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, Assignor does hereby *assign, transfer, set over and convey to Assignee all of Assignor's right, title and interest in and to the Stipulation and Agreement dated June 16, 1986* by and between Assignor and Sublessee (the "Agreement"), *and all payments due or to become due thereunder, all of Assignor's rights and remedies thereunder*, and all notes, contracts of guaranty or surety, and collateral of any kind or nature which Assignor has pertaining thereto, and the right either in Assignee's own behalf or in Assignor's name to take all such proceedings, legal, equitable or otherwise, that Assignor might take, save for this Assignment. Assignor warrants that this Assignment evidences a valid conveyance of the interests and rights of Assignor described in the Agreement, effective as against all persons." (Emphasis supplied).

The actual words of the assignment indicate that it was the stipulation and agreement only that were assigned to the plaintiffs. The stipulation and agreement, as we have seen, had to do with monetary payments to be made to clear up a large arrearage of unpaid rental payments and

---

1. As the words of the assignment between Lone Star and PLM make clear, it was the stipulation and agreement which were assigned to the PLM. That stipulation and agreement, which settled a portion of the Texas action, dealt purely with the receipt of two types of regular monetary payments: those eradicating an arrearage in past rentals and those dealing with present and future ones. We do not accept the defendant's argument that Lone Star must be joined as a party in the instant suit so that the defendant can raise defenses which could conceivably result in a finding that *no* debt is owed to Lone Star for the rental of allegedly defective tractor-trailers. This would be permitting the defendant to litigate against Lone Star certain issues that are completely outside the scope of the

stipulation and agreement. By the terms of the stipulation and agreement, the defendant unconditionally agreed to pay off an arrearage and to make continuing monthly rental payments in order to settle a portion of the parties' dispute. By becoming Lone Star's assignee, PLM stepped into Lone Star's shoes and they now have the same rights as Lone Star to these monies. Such rights include the right to expect the defendant to make these payments.

2. The plaintiffs are invited to re-read the terms of the assignment. We can find no assignment of the Paclease Agreements; if the plaintiffs can bring such to our attention there, we shall be happy to reconsider this point.

monetary payments to be made on a continuous basis for present and future rental payments.

We do not know the precise date when Lone Star declared bankruptcy, but an order dated April 17, 1987 stayed proceedings in the Texas action between Lone Star and the defendant in the instant case. In July, 1987, the plaintiffs in the instant case brought this action against the defendant for payments past due in the United States District Court for the Eastern District of Pennsylvania. There are three counts in the complaint: Count I Breach of Contract on the Stipulation and Agreement; Count II Breach of Contract on the Paclease Agreements; and Count III Unjust Enrichment.

We must begin our inquiry into the necessity of joining Lone Star in the instant action with Fed.R.Civ.P. 19(a). That section of the rule reads in pertinent part:

"(a) **Persons to be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party...."

Fed.R.Civ.P. 19(a)(1) concerns the spectre of incomplete relief. "To satisfy the requirements of compulsory joinder under the rubric of incomplete relief, defendants must show that any relief granted would be 'hollow' or 'partial'. Advisory Committee Note to Rule 19." *Baltica–Skandinavia Insurance Co., Ltd. v. Booth, Potter, Seal & Co., Inc., et al.,* No. 86–1967

(E.D.Pa. Sept. 15, 1986) [available on WESTLAW, 1986 WL 10114]. We do not believe that the problem in the instant case arises under subsection (a)(i). Rather, we are persuaded that, in the circumstances of the instant case, the defendant could conceivably run a substantial risk of incurring double obligations by reason of an apparent interest of Lone Star in the subject of the action. We are, therefore, concerned with the joinder provision found under Fed. R.Civ.P. 19(a)(2)(ii).

It has been said that "[r]ule 19 requires that in order for an absentee to be a person to be joined if feasible, the absent person must have a claimed or apparent interest in the ownership of the subject matter of the action. *Walton v. United States,* 415 F.2d 121 (10th Cir.1969)." *deVries v. Weinstein International Corp.,* 80 F.R.D. 452, 459 (D.Minn.1978). In the instant case, Lone Star is no longer an ordinary corporation; it is a corporation that has filed for bankruptcy and is currently under the protection of the Bankruptcy Court. Transfers of rights to monetary payments, such as that accomplished by the October 7, 1986 assignment between Lone Star and the instant plaintiffs, could—under certain circumstances—be subject to scrutiny and possible avoidance. It would appear, then, that Lone Star would have an "apparent" interest in the subject of this action.

It is the defendant who has raised the issue of the validity of the assignment. It does so because it fears multiple liability. It fears that, if this court upholds the validity of the assignment and finds it liable to the instant plaintiffs, it will have to pay once. If the debtor or someone on the debtor's behalf raises the issue of the voidability of the assignment in the Bankruptcy Court and that forum holds that that assignment should be avoided, it fears that it will have to pay twice. The plaintiffs argue that such fears are merely speculative. Given, however, the dates involved and the language of the Bankruptcy Code, we believe that the defendant has raised at least a colorable issue.

A look at certain dates in the instant case does create some reason for caution. The assignment from Lone Star to the plaintiffs was allegedly made on October 7, 1986. Although we do not know the precise date of Lone Star's · filing for bankruptcy, a court order dated April 17, 1987 stayed the proceedings in the Texas action. Assuming that the assignment was, in fact, made on October 7, 1986 and assuming that the date of Lone Star's petition in bankruptcy was on or about April 17, 1987, the assignment was therefore made within one year of the date of the filing of the bankruptcy petition. This scope of one year has significance under two sections of the Bankruptcy Code which deal with the avoidance of any transfers of property by the debtor. 11 U.S.C.A. § 548 (West 1979 and Supp. 1988) deals with "Fraudulent transfers and obligations." It reads in pertinent part:

"(a) The trustee may avoid any transfer of an interest of the debtor in property ... that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made ..., indebted; ...."

11 U.S.C.A. § 547 (West 1979 and Supp. 1988) deals with "Preferences" and reads in pertinent part:

" ...

(b) Except as provided in subsection (c) of this section [which has no application to the instant case], the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer · was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title...."

At this juncture, we know very little about the facts and circumstances surrounding the assignment of October 7, 1986. Were the validity of the assignment to be challenged in the Bankruptcy Court, however, those facts and circumstances would certainly be forthcoming and could possibly lead to an avoidance of the assignment. It is this possibility which leads to our caution and which makes us hesitate to dismiss the defendant's fears out of hand.

We find that we are somewhat in the same position as the United States District Court for the Southern District of Ohio in *American Financial Corp. v. General Electric Credit Corp.*, 97 F.R.D. 408 (S.D. Ohio 1983). That case concerned a corporation (Itel Corporation, a middle-man in arranging finance lease transactions) who had assigned its rights to receive payments under a Lease Service Agreement (LSA) from the owner of a leased aircraft (General Electric Credit Corporation) to American Financial Corporation to whom Itel owed money. Itel later declared bankruptcy. In litigation between American Financial Corporation and General Electric Credit Corporation over this assignment, the defendant, General Electric Credit Corporation, moved to dismiss the action on the ground that Itel was an indispensable party under Fed. R.Civ.P. 19, who, because of the automatic stay imposed by the Bankruptcy Code under 11 U.S.C. § 362, could not be made a party to this action.

Although the facts in *American Financial* were more complicated than the facts in the instant case, one issue of considera-

ble concern to the court was the possibility that the purported assignment might be challenged in the Bankruptcy Court. The court said:

"First, the LSA at issue is an executory contract and a Chapter 11 debtor has the right either to assume or reject an executory contract. 11 U.S.C. § 365. Second, the AFC—Itel agreement pursuant to which the purported assignment was made occurred approximately six months before Itel filed its Chapter 11 petition and thus could conceivably be challenged as a fraudulent conveyance, 11 U.S.C. § 548, or preferential transfer, 11 U.S.C. § 547. Assuming *arguendo* that this Court held that the assignment from Itel to AFC is valid, it is possible that either the debtor or someone on behalf of the debtor could raise either of the above issues in Bankruptcy Court and obtain a determination contradictory to this Court's holding. In that event, GECC would be subject to inconsistent obligations and at least conceivably might be forced to initiate yet a third lawsuit to settle this one issue."

*Id.* at 412–13.

The court in *American Financial* found itself confronted with a sea of "imponderables" in making its determination as to whether Itel was an "indispensable party." It concluded that "without further knowledge of Itel's rights and obligations as an entity under the protection of the Bankruptcy Court and a better understanding of the relationships between the parties it would be inappropriate to decide at this time whether Itel is an indispensable party." *Id.* at 409. The temporary solution which the court adopted was to stay the action so that the parties could seek relief from the automatic stay of the Bankruptcy Code for the purpose of these proceedings. Said the court:

"The automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362, provides:

(d) On request of a party in interest and after notice in a hearing, the [bankruptcy] court shall grant relief from the stay provided under subsection (a) of this section, such as by

terminating, annulling, modifying, or conditioning such stay—

1. for cause, including the lack of adequate protection of an interest in property of such party in interest ...

Thus if either the plaintiff or the defendant in this action requests relief from the automatic stay for purposes of the proceedings in this Court and relief is granted, Itel can appear in this Court so that we may make the factual determinations necessary to a decision on the issue of whether Itel is an indispensable party. Itel's appearance in this Court should assist us in understanding the relationships of the parties to each other and to the LSA, the effect of the bankruptcy proceeding on the LSA, and the intent of the parties in the various agreements, all of which are important in determining whether equitable considerations require that Itel be joined in this action...."

*Id.* at 413.

We believe that the circumstances of the instant case dictate some degree of prudence. We, therefore, adopt the approach taken in *American Financial*. We shall stay this action until January 2, 1989, to permit the parties to move the Bankruptcy Court for relief from the automatic stay of 11 U.S.C. § 362 so that Lone Star may appear in this court for the purpose of making the necessary factual determination whether Lone Star, by virtue of its status in bankruptcy has, in fact, an "apparent interest" in the stipulation and agreement which were assigned to PLM on October 7, 1986, and whether the defendant runs a "substantial" risk of double liability.